Chester McVay v. Halliburton Energy Svcs, Inc. Okay, Mr. Smith, when you're ready. Thank you, Your Honor. Good morning, everyone. May it please the Court. Halliburton initiated arbitration against... Please state your name. I'm sorry. My name is Todd Smith, and I represent the appellant in this case, Chester McVay. I apologize for that. Halliburton initiated arbitration against Mr. McVay, a former employee, asserting that he violated an intellectual property agreement he signed when he began his employment with the company. Was there a written submission to the arbitrator that the parties agreed to, other than the pre-dispute arbitration agreement? Do you mean in terms of what the governing or what the document was that required the parties to arbitrate? Or that specified what issues would be arbitrated? Well, there is a document attached to the motion to vacate the arbitration award that, as best I understand, not having been involved in that proceeding of the case, was the arbitration agreement that was an issue. It provides for application of the Federal Arbitration Act. That's the pre-dispute arbitration agreement. Yes, I believe that's correct, Your Honor. And that was the only one that you're aware of? As far as I know, and based on the record that's in front of the Court, I believe that to be true. In March of 2007, a single arbitrator issued an award in favor of Halliburton, granting it declaratory relief, injunctive relief, and damages for breach of contract and attorney's fees. Mr. McVay, as I mentioned, filed an application to vacate the award. It went to the magistrate judge up in the Northern District, who recommended that the award be confirmed. There was a cross-motion to confirm the award as well. The district judge then accepted the recommendations of the magistrate judge, signed a final judgment, therefore placing the power of the Court on that arbitration award, of course. Now, when we briefed this case, we had some issues that I think are now moot. We briefed essentially that the award should be vacated under Section 1084 of the Federal Arbitration Act for a couple of reasons, and also we raised Federal Rule of Civil Procedure 65 with respect to the scope of injunctions. We briefed some issues involving prejudgment interest and so forth, that because of the fact that Mr. McVay has now received a Chapter 7 bankruptcy discharge, that debt, as far as we understand it, has been discharged as a result of the bankruptcy and therefore the monetary aspect of this judgment should no longer be before the Court, I believe, in discussing this issue with the patient. You mean it's moot? Only the money damages. Which includes the interest. Excuse me? Which was the tail wagging the dog in this case. It may have been. At this point, though, Judge Clement . . . Trust me, things get out of kilter when they get to our levels. They certainly may. And, of course, I was involved at that phase of the case in the initial briefing, and in analyzing the case, of course, you're dealing with very limited issues you can raise to challenge an arbitration award, and we were trying to be mindful of that when we presented the case to the Court at the briefing stage, which has now been briefed for five years old. So we raised, of course, the issue that remains before the Court in our view, which is can this injunction be enforced, should it be enforced, or should it be vacated under either Section 1084 of the Federal Arbitration Act or Federal Civil Procedure 65D. And that's the primary issue I'd like to visit with the Court about today. All the issues relating to interest and attorney's fees are gone? I believe that to be true, Judge Davis. I mean, with the discharge having taken place, I just don't see that there's anything left of the monetary aspect of this judgment and this arbitration award. The injunctive relief would stand. Who told us this? Well, you may be right, Judge, and for that I apologize. However, the Court, you know, there was a suggestion of bankruptcy filed, and the Court received probably about 30 status reports from my opposing counsel in this case that included all the information about the bankruptcy. For timing purposes? For timing purposes, no doubt. But, you know, the principal issue from our perspective, issues one and two in our brief have to do with the scope of the injunctive relief, which is really, you know, that was clearly the more significant issue to Mr. McVeigh from the get-go, and we certainly would ask the Court to rule on the merits of that. In getting to that, you know, the obvious question is, well, okay, if there's been a bankruptcy discharge and all this stuff is now water under the bridge, why is the injunctive relief still important? And it is still important to Mr. McVeigh because he still is bound by what we think is an overbroad injunction that reaches way farther than should have been allowed under the circumstances. I saw it in one of your briefs. You said that you wouldn't complain if the injunction was limited to using the materials that McVeigh improperly took when he left Halliburton. Isn't that what the injunction covers? I would say that the injunction does cover that, but it covers far more as well. If you look at it in context, how much more does it cover? Well, it relates to anything, you know, utilizing in any fashion, any paper or electronic copies of any documents and tangible things that concern Halliburton products or services. The thing that concerns me about this is primarily the word concern, okay? The first dictionary definition of concern is simply relate to. So, you know. Well, if we read the injunction to mean documents that were taken by him from Halliburton, would that solve your problem? It would. Well, as I said in the brief, as Judge Clement pointed out, we would have a difficult time complaining about a reading that interpreted the injunction that way. I will totally concede that standing here today. The difficulty we have is the injunction says what it says, and what Mr. McVeigh, the reason I wanted to point out to the court or ask the question sort of rhetorically why this is still important is we have a person who is a mechanical engineer who has worked in the oil and gas industry, who has developed expertise in that area, who because of this injunction and the way, frankly, the way that all of this came about, his relationship with Halliburton ended, the pursuit of the arbitration, the award and judgment, and all the effort that Halliburton went to to prosecute these claims against him, he, you know, you could phrase this as a hypothetical because some of this is probably outside the record, but he has a legitimate concern about going and working in the oil and gas industry in the future because he doesn't know what Halliburton is going to get into in the future. Halliburton, you know, it's public knowledge that it's one of the largest oil and gas companies out there, and he just has a concern that this, he doesn't want to face this issue with Halliburton and have them pursue him for contempt of court now that there's been a final judgment rendered on this matter. You know, if there was, Judge Davis, a construction of this agreement that expressly limited it to the scope of what went on with his previous employment with Halliburton, you know, as I said, it would be difficult for us to complain about that at this stage of the case. Mr. McVeigh personally might have a different view, but I think in terms of advising him as his lawyer, knowing what the law is on attacking arbitration awards and injunctions, you know, that would be something that we would have to live with, I assume. The word concerning HES products and services is used in each paragraph of the award that it comprises the injunction, and it's clear in those paragraphs that what the arbitrator is talking about are the materials that Mr. McVeigh took with him, and that follows a long discussion about what he took, what he didn't disclose that he had taken, what he retained after he was told to give it back, and the arbitrator was not happy with your client and made clear that she found him lacking in credibility. Those findings are in the arbitration award. We can't run away from those, Your Honor. The only thing I will say about the difference between the portion of the injunction we're here to talk about versus those previous, the portions you've referenced, are those are all limited in time, and Mr. McVeigh had an obligation to do those things within a certain amount of time after the award. To this point, I am not aware that Hal Burton has been dissatisfied with how he performed those obligations. He only had the documents he had, whatever they were, whether they were in paper form or electronic form, and so he could actually, you know, physically perform the obligation to turn those documents over and be done. My concern is that he's read them, he worked with them, and that he, therefore, might use them. That's a standard concern in these kinds of cases, and the challenge is to address that without being overbroad or improperly expansive. I understand, Judge Arzenthaler. I think the difficulty here is, you know, one, the amount of time that's gone by now since this award was rendered and how much risk there would be to Hal Burton if there would actually be any use. You know, I've tried to understand the details of what Mr. McVeigh did for Hal Burton in terms of, you know, what an oil and gas well packer was and what a packing envelope was. I think, you know, this has to do with technology that's pretty commonly used, I believe, to get some of the liquids up from the surface without ruining the pipe and measuring what the limits are in that. These are, you know, other people in the industry are using the same kinds of technology, but whatever Mr. McVeigh would be doing today if he were to go and take a similar job, you know, we all know how technology has advanced in virtually every area in the last eight or nine years. You know, it's hard to say that whatever he learned and benefited from back then would really be applicable or any kind of a threat to Hal Burton today. But the second point I'd like to make in response to your question, Judge Arzenthaler, is, you know, is it right that Mr. McVeigh should have to live, regardless of what transpired before, under fear that he can't work in his chosen industry anymore because of Hal Burton? That assumes this very broad reading of the first paragraph of the introduction section of the award. It does. It absolutely does. And the Court certainly can construe it narrowly, and the Court can write an opinion. I presume construing it narrowly, and if Mr. McVeigh had the benefit of such an opinion, then that might alleviate some of his concern. You know, he probably still wouldn't be happy in the long run. Has he been working in the industry? He is not currently working in the oil and gas industry. Has he been in the industry? As far as I know, no, ma'am. As far as I know, he has not. And I can get into a whole different line of discussion about how this has all affected his career, but it's beyond the scope of what we're here to talk about today, and I wouldn't bore the Court with that. So, I mean, that, my take, at least it's a reasonable reading in my view, that this injunction is not limited on its face in a way that it should be, relevant to what Mr. McVeigh was doing for Hal Burton back between 2001 and January of 2006. And it actually includes documents that don't even exist or didn't even exist back then, and requires the projection, as it's written now, of what Hal Burton would get into in the future. And that's something that no former employee, no matter what their conduct may have been, or at least as found by the arbitrator, ought to have to live in the shadow of going forward in their career. You know, taking this back, just to try to loop it back to the legal standards that we're applying, I mean, the Court's reviewing this case de novo, the application of both the 10A4 Federal Arbitration Act standard and Federal Rule Civil Procedure 65D, and those really, I think they're just almost virtually interchangeable in this case, because the opinions that we've pointed out in our briefing, the Diapos case and the IDS case, which was a Judge Posner opinion out of the Second Circuit, I'm sorry, Seventh Circuit. I don't want to misspeak about that. Those opinions do relate. You basically look at, and it's something this Court has never done as far as I can tell, look at 10A4, the definiteness factor of 10A4 in terms of, well, if this were an injunction, would it be enforceable? And it does provide, 65D does provide a useful, logical tool for analyzing the second part of a 10A4 analysis. So often what the Court hears when it hears 10A4 challenges is the arbitrators exceeded their powers. We haven't alleged that here. We're talking about whether they completed a definite award. And this Court has not written extensively on that topic at all. This certainly does provide an opportunity for the Court to do that. So. Do you have any other issue you want to talk about? I do not, Your Honor, and if it pleases the Court, I will have a seat and wait for my rebuttal. Okay. Do you have any time left for rebuttal? Thank you, sir. Okay, Mr. Dower. David Jores for Halliburton. I guess to start off with, we agree that the, you know, the pre-judgment interest part of the case is moot. We don't have any reason to have any arguments. You've washed up a little bit, Mr. Jores. Yes, sir. Especially when you're saying something this important. Okay. We don't have any rebuttal to that, that the pre-judgment interest part of the case is moot. On the injunction, this injunction is what the arbitrator came up with after over a week of testimony and actually hearing all the evidence. The arbitrator concluded McVeigh demonstrated he couldn't be trusted, and this was the only way to ensure his compliance with the intellectual property agreement. The arbitrator also found that HES was the owner of all right, title, and interest in the software program, and that McVeigh had no right to use it, therefore. And this, there would be no time limit on that. If the court believes the injunction should be clarified, we believe that McVeigh's interpretation set forth in his opening brief is a reasonable and proper interpretation that HES would agree to. You probably have it in front of you there, but, you know, namely, he would not complain about an injunction limited to any materials he allegedly, the word allegedly probably doesn't belong in there, but he retained after leaving HES that concern HES products or services within his job, duties, or knowledge acquired as an employee. That would also satisfy his duration complaint the way he's phrased it, you know, namely, that he has no way of knowing what industries or lines of business HES would enter in the future. And in terms of the rest, well, that also answers his contention about, you know, all kinds of new technology and all sorts, you know, all that would be subject to the injunction also. That's really all we have to say about it other than the standard law about injunctions. You look at the context and, you know, I'm sure the court's familiar with the context, how he copied over one gigabyte of data from his office computer. He made multiple trips to HES headquarters, removed hundreds of pages of documents at his exit interview when HES asked him to return property. He all of a sudden claimed ownership of it, the software program. A TRO was entered. He didn't fully comply with the TRO in terms of the thumb drive. He did not disclose the existence of it until shortly before the hearing began. It was inconceivable to the arbitrator that he did not even admit to removing confidential information. HES had to expend substantial time proving that the documents contained confidential information because he contested that. So, therefore, a broad injunction was justified in this case. I'm sure the court's familiar about those cases. Defendants demonstrated untrustworthiness supports issuing a broad injunction. And I'm sure the court's also aware that McVeigh's contention should not be, in other words, you can't attack the merits at this stage. That's all. But, anyway, that's really all we have to say. Okay. Thank you very much, Mr. George.  Mr. Smith, do you have anything to add? No. Very, very briefly, Your Honor. Thank you. May it please the court. While Mr. McVeigh may disagree with the facts the arbitrator found, we certainly recognize that this is not the time or place to challenge those. We're stuck with the facts as found by the arbitrator. We're here to ask the court for relief from what is, you know, it's a legal issue, pure and simple. And we've always couched it that way. I don't think I've ever eaten my words as much as I've been eating them in the last, you know, well, five minutes and since before then, from five years ago about what I thought, you know, Mr. McVeigh might or might not find agreeable. It was intended, I think, at the time as an illustration of how this injunction could have been written, but it wasn't. And as Mr. George pointed out, you know, the arbitrator wrote this injunction. The parties didn't even really have any input on that element of it. But all that's to say, you know, without an opinion that construes this injunction as narrowly as what Mr. George would ask, and certainly we would probably even go narrower, but, you know, it's not much good to Mr. McVeigh. What the court could do in terms of what we're asking the court to do, certainly if the court could write an opinion that makes that sort of construction, that would be of some solace to Mr. McVeigh, I believe, and would accomplish some part of what we intended to accomplish. Another option, because we're looking at an injunction that was carried through by a judgment from the district court, would be a remand to the district court and possibly, you know, further proceedings before the arbitrator to narrow the scope of that injunction to something permissible. And so with that, unless the court has further questions, I'll stop. Okay, thank you very much. Thank you, gentlemen. We have your case.